UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No. 2:17-CR-73 JD

JAMES E. RANOCHAK et al.

## OPINION AND ORDER

The parties have filed a number of motions in limine relative to the trial in this case. The Court addresses each of them below. Where the motions are granted or taken under advisement, the parties will be barred from disclosing the relevant issues or arguing them to the jury during trial. If either party wishes to raise any of those matters, they must first seek the Court's permission outside the presence of the jury.

### A.  Government's Motions in Limine (DE 266)

#### (1) Jury nullification

The Government asks to preclude Defendants from suggesting to the jurors that they should acquit them even if they find that the Government has met its burden of proof to convict them. Defendants don't object to this motion. Because an invitation to acquit a defendant even if one is guilty is an invitation for an unreasonable verdict, *see United States v. Perez*, 86 F.3d 735, 736 (7th Cir. 1996) ("An unreasonable jury verdict, although unreviewable if it is an acquittal, is lawless, and the defendant has no right to invite the jury to act lawlessly."), the Court GRANTS the Government's motion.

#### (2) Sentences Faced by Defendants upon Conviction

The Government asks to preclude Defendants from arguing about the possible punishments Defendants may face if found guilty of the charges in the Indictment. Defendants do not object to the motion.

Argument before a jury about punishment is improper because it is irrelevant to the jury's determination of innocence or guilt. *See Shannon v. United States*, 512 U.S. 573, 579 (1994) ("It is well established that when a jury has no sentencing function, it should be admonished to "reach its verdict without regard to what sentence might be imposed.") (citing *Rogers v. United States*, 422 U.S. 35, 40 (1975). According, the Court GRANTS the Government's motion.

### (3) Cooperating Witness Penalties

As a corollary to its motions regarding the penalties faced by Defendants, the Government asks to preclude any evidence regarding the penalties faced by the Government's cooperating witness, Dr. Syed Sohail. Again, Defendants don't object.

Under the Sixth Amendment, the defendants are guaranteed an opportunity to effectively cross-examine witnesses against them, but a district court has discretion to place reasonable limits on cross-examination, including limiting irrelevant or confusing evidence. *United States v. Trent*, 863 F.3d 699, 704 (7th Cir. 2017). Allowing the Defendant to inquire into the exact length of the maximum sentence or exact guideline ranges of cooperating witnesses who were charged with the same or similar crimes as Defendants would provide the jury information with which it could infer their potential sentence. The Seventh Circuit has emphasized that such information can be irrelevant and confusing. *Id*. Accordingly, the Court GRANTS the motion in limine to the extent it seeks a bar on inquiring into the exact sentences and guideline ranges of cooperating witnesses who were charged with the same or similar crimes as Defendants. However, as the

Seventh Circuit explained in *United States v. Gibson*, Defendants still must have a reasonable opportunity to expose the witnesses' biases, motives, and incentives. 996 F.3d 451, 466–467 (7th Cir. 2021). To allow this inquiry, the Court emphasizes that defense counsel may cross-examine witnesses about these biases. Defense counsel may ask witnesses about whether the sentences they faced were "substantial," or whether they faced a mandatory minimum. But the defense may not inquire into the exact length of sentences and guideline ranges of cooperating witnesses. *See United States v. Ashe*, 101 F. App'x 641, 642–43 (7th Cir. 2004) ("So long as the cross-examination elicits adequate information for the jury to assess a witness's credibility, motives, or possible bias, the Sixth Amendment is not compromised.") (quotation marks, ellipses, and citation omitted).

### (4) Argument/Questioning on Defendants' Age, Health, or Family

The Government asks to preclude Defendants from making arguments to the jury about their age, health, or family ties. Defendants don't object to the Government's motion. Because such evidence appears to be irrelevant at this trial, the Court GRANTS the Government's motion.

### (5) Comments Regarding Evidentiary or Pretrial Rulings

The Government asks to preclude Defendants from referring to excluded evidence or from commenting on the Court's pretrial rulings. Defendants don't object to the Government's motion. Because argument or examination regarding excluded or inadmissible evidence is improper, the Court GRANTS the motion.

*(6) Requests for and Comments about Discovery before Jury*

The Government asks to preclude Defendants from requesting discovery from witnesses or the Government, moving the Court for such discovery, or otherwise commenting on discovery matters, in the presence of the Jury. The Government is concerned that such requests may create the impression that the Government has suppressed information as a means of seeking an unfair advantage.

Defendants object to the Government's motion arguing that there are considerable indications that the Government either lost, mishandled, or tampered with the evidence. Defendants submit that, when they inspected files in August 2019, they found multiple missing documents that they believe should have been in the files. They believe that the Government has mishandled the evidence, which hindered their defenses.

The Court GRANTS the Government's motion because what may have transpired during discovery is irrelevant to the charges in this case. In addition, such comments in the presence of the jury could create the impression that the opposing party is withholding information. To the extent Defendants may seek to exclude certain evidence based on unfair surprise or under some other theory, any such argument must be made outside the jury's presence. In addition, both sides must notify the Court of any additional discovery requests before commenting on those requests in the presence of the jury.

*(7) Improper Vouching by Reference to Former Employment*

The Government asks to preclude Defendants' attorneys from referring to their experience as former prosecutors to bolster the testimony of their witnesses. Defendants don't

object. Because attorneys may not vouch for a witness by expressing their own beliefs as to the truthfulness of a witness or by implying facts not before the jury to lend a witness credibility, *see United States v. Amerson*, 185 F.3d 676, 686 (7th Cir. 1999), the Court GRANTS the motion.

### (8) Introduction by Defendants of their own (or Co-Defendants') Statements

The Government asks to preclude Defendants' from introducing at trial their own or each other's statements, unless they can show that the statements are offered for a relevant, non-hearsay, purpose, or that they fall within an exception to the hearsay rule. Defendants don't object. Because it is well established that Defendants cannot introduce their own statements at trial unless an exception to hearsay applies, *see, e.g., United States v. Faruki*, 803 F.3d 847, 857 (7th Cir. 2015) (defendant was not entitled to introduce his own hearsay statements through a witness to "impeach" earlier statements defendant had made that were already in evidence), the Court GRANTS the motion.

### (9) Defining Reasonable Doubt

Without an objection from Defendants, the Government asks that the Defendants be prohibited from defining reasonable doubt to the Jury. Since it is settled in this Circuit that neither trial courts nor counsel should attempt to define reasonable doubt for the jury, *see United States v. Langer*, 962 F.2d 592, 600 (7th Cir. 1992) ("It has been, and continues to be, 'our opinion that ... defining reasonable doubt presents a situation equivalent to playing with fire.'"), the Court GRANTS the motion.

### (10)      Outrageous Government Conduct

The Government asks to bar Defendants' from presenting evidence or making arguments to the jury suggesting that they should be acquitted because the government has engaged in misconduct in the course of its investigation. Defendants don't object. Even assuming there is any evidence that the Government engaged in outrageous conduct, "[o]utrageous government conduct is not a defense in this circuit." *United States v. Stallworth*, 656 F.3d 721, 730 (7th Cir. 2011). Accordingly, the Court GRANTS the motion.

*(11)       Evidence and Argument Concerning Defendants' Lawful Conduct*

The Government requests that the Court exclude evidence of Defendants' lawful conduct, except reputation or opinion evidence offered within the limitations of Federal Rule of Evidence 405(a), arguing that such evidence is irrelevant to their intent as to the charged offenses. In addition, the Government submits that such evidence may be improper propensity evidence under Rule 404(b).

Defendants object to the motion arguing that they should be permitted to present exculpatory material during the course of the trial, particularly those instances where they need to explain the Government's recordings. In addition, Defendants maintain that they should be allowed to present evidence that they acted in accordance with the usual course of professional practice and for legitimate medical purposes.[1]

"Evidence that a defendant acted lawfully on other occasions is generally inadmissible to prove he acted lawfully on the occasion alleged in the indictment." *United States v. Reese*, 666

---

[1] In their opposition to the Government's motion, Defendants indicated their intent to contend at trial that the Government entrapped them. Consequently, they argued that evidence of lawful conduct was admissible to show their predisposition not to commit the charged crimes. However, at the Final Pretrial Conference, each Defendant's counsel confirmed that they now do not intend to assert a defense of entrapment, so this justification is no longer applicable.

F.3d 1007, 1020 (7th Cir. 2012). To the extent that Defendants may wish to introduce such evidence, the Court will exclude it. *See* Fed. R. Evid. 404 ("Evidence of any . . . act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."); *see United States v. Daneshvar*, 925 F.3d 766, 779 (6th Cir. 2019) ("[W]e have held that for the same reason that prior 'bad acts' may not be used to show a predisposition to commit crimes, prior 'good acts' generally may not be used to show a predisposition not to commit crimes.") (quotation marks and brackets omitted). On the other hand, if Defendants have a legitimate purpose for including evidence of lawful conduct, the Court will allow it. However, in their response to the Government's motion, Defendants have not identified any such conduct nor the propensity-free basis for presenting it at trial. While Defendants believe that they should be able to present evidence of their lawful conduct "to more fully explain the matters that the Government has captured on audio and video" (DE 289 at 4), they do not provide any details and the Court is unable to determine on its own what kind of conduct Defendants have in mind.

Finally, Defendants state in passing that they should be allowed to present evidence that they acted in accordance with the usual course of professional practice and for legitimate medical purposes, but they do not explain how the evidence of their lawful conduct sheds any light on whether the charged acts were done for legitimate reasons.

In summary, the Court GRANTS the Government's motion to exclude evidence that Defendants acted lawfully on other occasions. If during the course of trial, Defendants believe that the evidence of their prior good acts is admissible, they should approach the Court first before presenting any such evidence to the Jury.

> *(12)      Prior Notice Concerning Rule 608(b) Impeachment*

Rule 608(b) controls the limits of testimony regarding a witness's character for truthfulness or untruthfulness:

> Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of:
>
> (1) the witness; or
>
> (2) another witness whose character the witness being cross-examined has testified about.

The Government asks that Defendants identity, outside the presence of the jury, any prior "bad acts" before seeking any impeachment of a witness under this Rule. Defendants object to requiring such disclosures before cross-examination because the Government hasn't supported its motion with any case law and no rule requires such a procedure.

 The Court GRANTS the motion. While the rules of evidence do not provide for a specific procedure for the Court to address the rulings related to Rule 608(b), it is helpful to the Court to identify any evidentiary issues as early as possible. Therefore, if the parties are aware of any basis for impeaching a witness under Rule 608(b), they should bring that to the attention of the Court before the witness is called to the stand. Needless to say, the same requirement applies equally to the Government as it does to Defendants.

> *(13)      Cross-Examination on Prior Arrests*

Some of the Government's witnesses have been arrested but not convicted of any wrongdoing. The Government requests that Defendants be precluded from introducing into evidence the existence of any such arrests. Defendants don't object to the motion. Since there's

no suggestion that any of the arrests implicate a witness's character for truthfulness, the Court GRANTS the Government's motion.

### B.  Government's Motions in Limine (DE 267)

*(14)        Testimony of Defendant Losier's Ex-Wife[2]*

The Government anticipates calling Defendant Losier's ex-wife, Sarah Losier, to the stand. Ms. Losier was married to Losier until October 2013. She testified under oath in 2017, implicating Losier in criminal activity occurring during the timeframe of, and related to, the Indictment. The Government believes that neither adverse spousal testimony privilege nor the marital communications privilege applies to Ms. Losier because she's no longer married to Losier and because her testimony is related to her observations, not confidential communications with Losier.

When the Government filed this motion, Losier's counsel was excused from filing a response because he was in the process of withdrawing from the case, and to date, no response has been filed. The Court takes this MOTION UNDER ADVISEMENT and will address it at the final pretrial conference and, if necessary, will give Losier's current counsel the opportunity to respond to the motion in writing.

*(15)        Admission of Rule 1006 Summary Charts*

The Government seeks permission to admit the summaries of evidence pursuant to Rule 1006. The Government submits that the evidentiary foundation for the charges against

---

[2] Although the Government filed several briefs in support of its motions in limine, it retained the sequential numbering of the issues for which it seeks the Court's preliminary rulings. The Court follows the same numbering sequence.

Defendants is voluminous both in scope and type of records so that comprehension by the jury would not only be difficult but inconvenient. Defendants object to the motion on the grounds that the Government has provided them neither the summary charts nor with the underlying documents. (DE 288 at 2.)

Rule 1006 allows the proponent to "use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. However, before the proponent can use such instrumentalities, it "must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court." *Id.*

Here, Defendants claim that the Government has not provided them with the summaries nor with the copies of the underlying documents, but at the Final Pretrial Conference the attorneys for both sides indicated that they should be able to resolve this matter on their own. Accordingly, the Court takes the Government's motion UNDER ADVISEMENT until the status of these materials can be ascertained.

    *(16)       Other-Acts Evidence*

(a)  Canterbury Pharmacy

The Government requests that the Court allow it to present evidence of "other acts," including alleged illegal acts by Defendants Ringger and Ranochak at Canterbury Pharmacy. The Court has addressed this motion as part of its ruling on the Government's *Santiago* proffer. (*See* DE 404.) For the reasons explained in that order, the Court GRANTS the Government's motion.

(b) Alleged False Statements in Application Documents for North Anthony Pharmacy and Wellness Center

On February 23, 2012, North Anthony Pharmacy and Wellness Center registered with the DEA as a retail pharmacy. The registration identified Losier as the owner and Ringger as the manager. On his initial registration form (DEA Form 224A) and subsequent renewals, Losier failed to disclose as required that his pharmacist license was suspended in 2002 after he pled guilty to stealing over $80,000 from a previous employer. Had he truthfully answered the question, the DEA would have flagged the registration, delaying the opening of the pharmacy. The Government submits that Losier's false statement on the application was done in furtherance of the criminal conspiracy and can therefore be properly presented to the Jury. In the alternative, the Government states—and this is the entirety of its position on the issue—that "the evidence is admissible under 404(b)." (DE 267 at 11.)

Defendants object to the admission of the allegedly false statements on the DEA Form 224A. They argue that the Government's request amounts to *ipse dixit* assertions as they're not supported by any authority or explanation. Also, on September 8, 2022, Losier filed a separate response, emphasizing that ten years had passed between the time he lost his license and the beginning of the alleged conspiracy. He suggests that the disciplinary action is too old to be admitted into evidence. Losier also argues that the evidence of losing his license is dissimilar from the charges in this case and therefore should not be admitted. Finally, he contends that it would be unfairly prejudicial to Losier to allow the evidence of his suspended license.

"Federal Rule of Evidence 404(b) excludes evidence used 'to prove the character of a person in order to show action in conformity therewith.'" *United States v. Adams*, 628 F.3d 407, 414 (7th Cir. 2010)  (quoting Fed. R. Evid 404(b)). Rule 404(b) "allows the use of other-act evidence only when its admission is supported by some propensity-free chain of reasoning."

*United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014). In other words, "Rule 404(b) excludes the evidence if its relevance to 'another purpose' is established only through the forbidden propensity inference." *Id*. Even though 404(b) lists certain permissible uses of other act evidence, the list is "non exhaustive." *United States v. Johnson*, 584 F.3d 731, 736 (7th Cir. 2009)(citing *United States v. Taylor*, 522 F.3d 731, 735 (7th Cir. 2008). "Notably, Rule 404(b) only applies to '[e]vidence of *other* crimes, wrongs, or acts . . . .' So, if the evidence is admitted as direct evidence of the charged offense, Rule 404(b) is not applicable. *Adams*, 628 F.3d at 414 (citation omitted). "Specifically, evidence directly pertaining to the defendant's role in a charged conspiracy is not excluded by Rule 404(b). Of course, Rule 403 may continue to protect the defendant against admission of the evidence if it would be 'unduly prejudicial.'" *Id*.

Although the Government has provided only a bare bones justification to admitting Losier's false statement on the DEA application, the Court does find that the false assertion is admissible because it was an act in furtherance of the conspiracy. In other words, Rule 404(b) is inapplicable because the challenged evidence is direct evidence of Losier's role in the charged conspiracy and not propensity evidence. In order to sell the controlled substances under the alleged guise of medical services, Defendants needed the cover of the pharmacy, which they could not have—at least not as quickly—without Losier lying to the DEA. The DEA registered the pharmacy in February 2012, making Losier's application relevant to the conspiracy that is charged to have started around January 2012. Although Losier argues that the evidence is too old, he's focusing on the wrong evidence. He concentrates on the loss of his license in 2002, but the most relevant evidence here is that Losier lied in 2012 on the application to register the Pharmacy. There's nothing stale about that evidence as the conspiracy is said to have also begun in 2012. The same is true of his comparing the loss of the license to the instant charges. Again,

what's most important here is not that Losier lost the license but that he lied about that in order to further the conspiracy. Moreover, the application lists Ringger as the manager of the pharmacy, further supporting the Government's contention that the false submission was in furtherance of the conspiracy as opposed to a lone "other act." In balancing the Government's interest to prosecute its case and Defendants' interest to prevent the admission of unduly prejudicial evidence, the Court finds no conflict here. Given that this evidence is closely related to the charged conspiracy, it is highly relevant evidence that will have no unduly prejudicial effect on the Jury. "Evidence is unduly prejudicial if it creates a genuine risk that the emotions of the jury will be excited to irrational behavior, and the risk is disproportionate to the probative value of the offered evidence." *United States v. Loughry*, 660 F.3d 965, 974 (7th Cir. 2011). There's no such risk here nor is the probative value of the evidence that Losier lied on the DEA application outweighed by a danger of "confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. However, the Court agrees that the Government should be precluded from going into the details of why Losier lost his license. Accordingly, the Court GRANTS the Government's motion.

(c) Illegal Manufacturing of Controlled Substances

The Controlled Substances Act permits pharmacies to compound controlled substances only on an individual patient basis. Because the North Anthony Pharmacy did not have a manufacturing registration, it was prohibited from stockpiling compounded controlled substances. Moreover, the Pharmacy was only authorized to fill prescriptions actually issued. Yet, Losier and Ringger allegedly compounded controlled substances even before receiving the prescriptions. In fact, at the time of the search of the Pharmacy on September 11, 2013, the

agents found more than 4,000 capsules of Methadone and Hydrocodone on its shelves. The Government submits that the evidence of Losier and Ringger compounding controlled substances is admissible as acts in furtherance of the conspiracy.

Defendants object, arguing that Defendants have not been charged with illegal manufacturing of controlled substances, which according to them means that compounding and storing the controlled substances at the pharmacy wasn't done in furtherance of the charged conspiracy.

As with Mr. Losier's false statement, so here, the evidence that Losier and Ringger compounded controlled substances are acts in furtherance of the conspiracy, not subject to Rule 404(b). Although these acts were not charged in the Indictment, that is not dispositive to the issue of admissibility where, as here, the evidence is embraced by the conspiracy in the Indictment. *See United States v. Alviar*, 573 F.3d 526, 538 (7th Cir. 2009) ("When evidence is embraced by the conspiracy in the indictment, the court need not resort to Rule 404(b) analysis. Rule 404(b) is inapplicable where the 'bad acts' alleged are really direct evidence of an essential part of the crime charged.")  The Government's evidence suggests that Losier and Ringger did not wait for prescriptions before compounding controlled substances. Instead, they stockpiled controlled substances, presumably because Ranochak's prescriptions never varied, which is a further indication of the conspiracy to distribute controlled substances. Moreover, because the proposed evidence falls squarely within the bounds of the Indictment, the Court finds that no undue prejudice would result from presenting these facts to the Jury. Accordingly, the Court GRANTS the Government's motion.

(d) Possession of Testosterone

On September 11, 2013, the agents searched Losier's and Ranochak's homes. In each home, they found bottles with Testosterone. The bottles contained prescription labels from the North Anthony Pharmacy, but the labels had no other information, such as who wrote the prescription and for whom. Subsequent research failed to find the record of these prescriptions either in the database of the state of Indiana or the Pharmacy's files.

Losier was charged in state court, but in November 2013, his counsel produced an affidavit from Ranochak claiming that Losier had been under his care since January 2012 and that on May 6, 2013, he issued Losier three separate prescriptions for Testosterone. Copies of prescriptions allegedly written on May 6 accompanied the affidavit. Subsequently, the state charges were dismissed.

The Government maintains that the affidavit was false and the prescriptions were fabricated. No Testosterone prescriptions for Losier were found at the Pharmacy and there is no record of him ever being Ranochak's patient. The Government insists that the prescriptions from Ranochak were subsequent fabrications for the purpose of concealing the conspiracy and protecting a co-conspirator. Accordingly, the Government asks that this evidence be presented to the jury since it is evidence of acts in furtherance of the conspiracy.

As for Ranochak, he initially claimed that Testosterone belonged to his son. As in Losier's case, there were no records at the Pharmacy showing that anyone in Ranochak's family was issued Testosterone prescriptions. Nonetheless, in November 2013, Ranochak sent the DEA Testosterone prescriptions that another doctor had written for him.

The Government asks that it be allowed to present this evidence to the Jury as it believes it to be part of the criminal conspiracy to dispense and distribute controlled substances (Testosterone is a Schedule III controlled substance).

Defendants object to the motion, arguing that this evidence is irrelevant to the charges against them, especially because there's no evidence that either of the two defendants benefited financially. Defendants point out that the elements of the conspiracy charge require only proof that there was a conspiracy and that Defendants knowingly joined the conspiracy with an intent to advance it. They then claim that the Government's evidence consists of two isolated and independent transactions of distribution, which cannot be treated as part of a conspiracy. Finally, Defendants insist that, in any case, the evidence is misleading and confusing to the jury and should therefore be excluded under Rule 403.

As in all of the discussion so far, the initial question once again is whether the evidence of Testosterone bottles at Losier's and Ranochak's homes, as well as the subsequent coverup, are probative of the charged offense, that is, the conspiracy to distribute controlled substances. The elements of the charge are simple enough: did a conspiracy to distribute controlled substances exist, and if so, were Defendants members of that conspiracy? *See United States v. Barrios-Ramos*, 732 F. App'x 457, 461 (7th Cir. 2018) ("We observed in [*United States v. Sweeney*, 688 F.2d 1131, 1140 (7th Cir. 1982)] that the 'essential elements ' of a section 846 conspiracy 'are the existence of an agreement between two or more individuals, with the intent to commit an offense in violation of the Controlled Substance Act.'"). The controlled substances that are the object of the conspiracy in Count 1 of the Indictment are Methadone, Hydrocodone, and Testosterone. So the seemingly unauthorized possession of Testosterone by Losier and Ranochak is probative to proving the alleged conspiracy. Although the Indictment does not specifically allege these incidents, the presence of Testosterone bottles in the homes of the two defendants, containing North Anthony Pharmacy's labels without any other identification, is relevant to the question of whether the conspiracy existed and, if so, who its members were.

16

However, the Court will not admit into evidence Ranochak's affidavit or the purported prescriptions for Losier, or the prescription from another doctor to Ranochak, at least not under the Government's theory that these acts were carried out in furtherance of the conspiracy. Just because the Indictment charges a conspiracy does not mean that everything done by a conspirator is admissible. More than seventy years ago, the Supreme Court held that conspirator acts which went to an "uncharged conspiracy aimed at preventing detection and punishment" were not admissible as to the original criminal conspiracy. *Krulewitch v. United States*, 336 U.S. 440, 444 (1949). In *Krulewitch*, two defendants, a male and a female, induced another female to travel across state lines for purpose of prostitution. Several months after the two defendants had already been arrested, and after the victim returned to her home state and resumed her life there, the female defendant counseled the victim to take the blame onto herself and away from the male defendant, even though he was guilty of the crime. The government wanted to introduce the female defendant's statements under the theory that they were made in furtherance of the conspiracy to transport the victim across the state lines for the purpose of prostitution. The Supreme Court disagreed, finding that the "hearsay declaration, attributed to a co-conspirator, was not made pursuant to and in furtherance of objectives of the conspiracy charged in the indictment, because if made, it was after those objectives either had failed or had been achieved." *Krulewitch*, 336 U.S. at 442.

A decade later, the Supreme Court reaffirmed this principle in *Grunewald v. United States*, 353 U.S. 391 (1957). There, taxpayers and their lawyers conspired to bribe Internal Revenue Service officials to avoid criminal liability. The scheme worked and payments were made, but several years after the conclusion of the conspiracy, Congress learned of the corruption and began investigating. The "conspirators felt themselves threatened, so they took

steps to hide them . . . [T]he taxpayers were repeatedly warned to keep quiet." *Grunewald*, 353

U.S. at 395–96. One of the conspirators attempted to induce the taxpayers not to reveal the

conspiracy and another "asked his secretary not to talk to the grand jury." *Id*. The question before

the Supreme Court was whether these actions, intended to conceal the original conspiracy,

extended that conspiracy beyond its completion date, so that the statute of limitations reached the

original conspiracy. The Supreme Court answered with a resounding no:

> The crucial teaching of *Krulewich* . . . is that after the central criminal purposes of
> a conspiracy have been attained, a subsidiary conspiracy to conceal may not be
> implied from circumstantial evidence showing merely that the conspiracy was kept
> a secret and that the conspirators took care to cover up their crime in order to escape
> detection and punishment. As was there stated, allowing such a conspiracy to
> conceal to be inferred or implied from mere overt acts of concealment would result
> in a great widening of the scope of conspiracy prosecutions, since it would extend
> the life of a conspiracy indefinitely. Acts of covering up, even though done in the
> context of a mutually understood need for secrecy, cannot themselves constitute
> proof that concealment of the crime after its commission was part of the initial
> agreement among the conspirators. For every conspiracy is by its very nature secret;
> a case can hardly be supposed where men concert together for crime and advertise
> their purpose to the world. And again, every conspiracy will inevitably be followed
> by actions taken to cover the conspirators' traces.

*Id*. at 401–02.

The same principles apply in the instant case. The search of the Pharmacy and of Losier's

and Ranochak's homes took place on September 11, 2013. On this date, the Pharmacy shut down

and never reopened, and Defendants did not work together again. In other words, by then, any

conspiracy to distribute controlled substances was finished. Two months later, in November

2013, Ranochak submitted his affidavit and purported prescriptions for Losier. Around the same

time, Ranochak provided prescriptions for himself, supposedly issued by another doctor. These

facts follow the same pattern as the facts in *Krulewich* and *Grunewald*: first there's the alleged

conspiracy; then an investigation, followed by an attempt to cover up tracks. But covering up the

tracks several months after the allegedly unlawful conduct had ceased is not part of the original

conspiracy, and insofar as the Government posits that acts of concealment be allowed to be presented to the Jury because they constitute an ongoing conspiracy, the Court disagrees.

The Government also argues that "[a]lternatively, the evidence should be admitted under Rule 404(b)." (DE 267.) But the Government does not explain in the least how Rule 404(b) applies, let alone explain some propensity-free chain of reasoning. If the Government, which knows its case best, can provide no basis for invoking Rule 404(b), there is but one outcome to its proposed "alternative" theory: a firm no.

For these reasons the Court GRANTS IN PART and DENIES IN PART the Government's motion.

(e)  Ranochak's Statement to the DEA in July 2010

In 2010, Ranochak was working in the office of Dr. Adolph Yaniz. Dr. Yaniz was subsequently prosecuted in the Northern District of Indiana for illegally dispensing and distributing controlled substances without legitimate medical purpose. The Government claims that, in July 2010, Ranochak "made false statements to DEA Diversion investigators about the combination of drugs he prescribed and the amount of controls he prescribed while working at the office of Dr. Yaniz." (DE 267 at 17.) The Government requests that the Court allow it to cross-examine Ranochak, if he takes the witness stand, about these statements. Defendants object to the motion.

The Government's motion cites no reasons, let alone any authority in support of its motion, why it should be allowed to cross-examine Ranochak about the statements he made to the DEA in an unrelated case more than two years before the search of the Pharmacy and his home. If there is a good reason for letting the statements in, be it under Rule 607 or 608, the

Government has not provided it, and in our adversarial system it is not the Court's job to fashion the Government's arguments. Therefore, the Government's motion will be denied on that basis alone. But even if the statements are relevant, they must be excluded because their probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, [and] wasting time." Rule 403. Discussing the conviction of Dr. Yaniz as well as Ranochak's professional relationship with him will risk making the Jury believe that Ranochak is guilty in the instant case because of his association with a convicted criminal in another case. In addition, introducing the evidence about Dr. Yaniz and Ranochak's relationship with him may confuse the Jury and waste their time. For these reasons, the Court DENIES the Government's motion.

(f) Defendants' Tax Reports

The Government claims that it has evidence that the conspiracy to distribute controlled substances was mutually beneficial to Defendants and highly lucrative. Apparently, 90% of all prescriptions filled at the North Anthony Pharmacy in 2012 and 2013 were issued by a single physician, Ranochak. The Pharmacy records from those years show gross income of more than $600,000 directly attributable to Ranochak's prescriptions. In addition, Ranochak accepted payments in cash only, collecting hundreds of thousands of dollars in revenue. For all the money, though, Ranochak's tax returns for those years show that he earned no income. Ringger filed a tax return in 2012 but included only the income received from the Pharmacy and not from his side business of urinalysis for Ranochak's narcotics patients. Ringger did not file a tax return for 2013.

The Government proposes to present this evidence to the Jury. It believes that the evidence is proper under Rule 404(b). In particular, it states that Defendants' "financial motives for their illegal drug dealing is particularly relevant in this case as Defendants intend to argue at trial that they were practicing medicine in good faith and prescribing and dispensing controlled substances solely for the medical benefit of the people coming into [the Pharmacy]." (DE 267 at 20.) Defendants object to the motion, arguing that the proposed evidence is an obvious example of propensity evidence and should be kept out under Rule 404(b).

The Court agrees with Defendants that the evidence of false tax returns or failure to file taxes is propensity evidence and therefore forbidden by Rule 404(b). Rule 404(b) "allows the use of other-act evidence only when its admission is supported by some propensity-free chain of reasoning." *Gomez*, 763 F.3d at 856. The Government submits that the evidence of tax fraud establishes Ranochak's and Ringger's motives, but that argument is misplaced. If true, Ranochak and Ringger conspired to illegally sell controlled substances to make themselves profitable, not to hide their profits from the IRS. In other words, whatever their motive for the conspiracy was, it was not driven by tax evasion. *See, e.g., United States v. Maclin*, No. 2:16CR179-PPS, 2017 WL 6422502, at *2 (N.D. Ind. Dec. 18, 2017) ("I frankly find 'motive' a puzzling assertion of purpose in [the embezzlement context]. How does failing to disclose the stolen money on the tax return demonstrate a motive for stealing the money?"). Furthermore, the Government does not explain how not filing tax returns or misreporting the income in this case points toward Defendants' guilt. Both men had a perfect cover for "normalizing" their illegal income: one was a physician and the other was a pharmacist, both respectable and well-paid professions. Of course, it could be that the amount of money they were actually earning was so above the general range of the two professions that it could have tipped the government about something being

amiss had they filed accurate tax returns, but the Government does not say so, and the Court won't speculate. Suffice it to say that it is up to the Government to provide a "propensity-free chain for reasoning" for the proposed evidence, and it has not done that here.

In support of its motion, the Government cites *United States v. Briscoe*, 896 F.2d 1476 (7th Cir. 1990), but that case is distinguishable. In *Briscoe*, the defendant was charged in connection with a heroin importation and distribution conspiracy. The defendant had no job, yet he was profiting nicely from illegal drug sales and failing to report the income to the IRS. The Seventh Circuit observed that "[i]t is well settled that in narcotics prosecutions, a defendant's possession and expenditure of large sums of money, as well as his or her failure to file tax returns, are relevant to establish that the defendant lacked a legitimate source of income and that, in all probability, the reason for the failure to report this income is due to the defendant's participation in illegal activities." *Id. at* 1500. Therefore, "[i]n the Rule 404(b) context, [defendant's] failure to file income tax returns evinced his knowledge and intent concerning his illicit narcotics trafficking activities.." But as discussed above, it is not at all clear that the same conclusion can be reached in the instant case, where the Government has not pointed out any other link between the alleged crimes and Defendants' failure to file accurate tax returns. Accordingly, the Court DENIES the Government's motion.

*(17)*     *Expert Testimony*

The Government intends to call four experts in support of its case-in-chief. Its motion in limine seeks to define the scope of their testimonies.

(a)  Medical Expert

The Government intends to call Dr. Timothy Lubenow to testify about the standard of care among medical professionals. Defendants have voiced no objection, so the Court will allow Dr. Lubenow to testify. As a result, the Court GRANTS the Government's motion.

(b) Pharmacy Expert

The Government also intends to call Dr. Carmen Catizone, MS, RPh, DPh,[3] to testify about the standard of care governing the pharmacists. Defendants object, claiming that his expert opinions are improper under the rules of evidence.

Title 21 U.S.C. § 841(a)(1) makes it a federal crime, "[e]xcept as authorized, . . . for any person knowingly or intentionally . . . to manufacture, distribute, or dispense . . . a controlled substance." Under applicable regulations, a prescription is "authorized" when a licensed practitioner issues it "for a legitimate medical purpose . . . acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). The Supreme Court of the United States recently clarified that "[a]fter a defendant produces evidence that he or she was authorized to dispense controlled substances, the Government must prove beyond a reasonable doubt that the defendant knew that he or she was acting in an unauthorized manner, or intended to do so." *Ruan v. United States*, 142 S. Ct. 2370, 2375 (2022). Therefore, to determine guilt, the jury must focus on the

---

[3] Defendants mock the Government for referring to Carmen Catizone as Dr. Catizone, insisting that he's "not a medical doctor; he is a pharmacist." (DE 288 at 29.) Yet, the Government has never claimed that Dr. Catizone is a medical doctor, that is, a physician. Rather, as his curriculum vitae suggests, in addition to his educational degrees, he has been granted a title of Honorary Doctor of Pharmacy by the Oklahoma State Board of Pharmacy in 2001. Of note, "[h]istorically, the Bachelor of Science in Pharmacy degree was sufficient for admission into a career as a pharmacist. In response to the increased complexity of pharmacotherapy and advanced training required for adequate provision of pharmaceutical care, however, the PharmD became the new entry-level degree for all practicing pharmacists in the United States in 2004." *When Can Pharmacists Use the Doctor Title?*, Pharmacy Times, March 8, 2016, https://www.pharmacytimes.com/view/when-can-pharmacists-use-the-doctor-title (last visited September 7, 2022.)

defendant's own mental state at the time the relevant drug was prescribed, rather than the mental state of a hypothetical reasonable doctor.

Jurors, who are lay people from all walks of life, are unlikely to know when a pharmacist is authorized to manufacture, distribute, or dispense a controlled substance. Therefore, to carry its burden of proof, the Government will require the testimony of an expert in this field. Rule 702 controls the opinions of expert witnesses at trial:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court emphasized the court's "gatekeeping" role in ensuring that expert testimony meets the criteria set forth in Rule 702. 509 U.S. 579 (1993).

> First, the district court must determine whether the testimony has been subjected to the scientific method; in other words, it must exclude testimony based on subjective belief or unsupported speculation. Second, the district court must determine whether the testimony has a sufficient nexus with the facts of the case and with the relevant inquiry that it will actually assist the trier of fact in understanding the evidence and performing its function as fact-finder.

*Korte v. Exxonmobil Coal USA, Inc.*, 164 F. App'x 553, 556–57 (7th Cir. 2006) (quotation marks and citations omitted). Thus, the courts must ensure that any expert testimony admitted is "not only relevant, but reliable." *Id*. at 589. A court, however, does not evaluate "the ultimate

correctness of the expert's conclusions." *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (quoting *Shultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013)). Rather, a court is required to consider only the "principles and methodology," not the conclusions generated. *Shultz*, 721 F.3d at 432 (quoting *Daubert*, 509 U.S. at 595). "So long as the principles and methodology reflect reliable scientific practice, 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id*. (quoting *Daubert*, 509 U.S. at 596).

In addition, legal opinions are not the proper subject of expert testimony. *See Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) ("The district court correctly ruled that expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible."). Nor can an expert merely suggest the outcome of the case. *See United States v. Noel*, 581 F.3d 490, 497 (7th Cir. 2009) ("Regardless of whether [the witness] was an expert, she could not 'merely tell the jury what result to reach.'"). "In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." Fed. R. Evid. 704.

The Court will allow Dr. Catizone to provide expert testimony, but his testimony must be much more limited than the opinions he has offered in his expert report. It is acceptable for Dr. Catizone to testify that the standard of care requires pharmacists to be licensed in the state in which they practice and to abide by the rules and regulations of the state. He can explain the steps a pharmacy would take to ensure that controlled substances dispense pursuant to a valid prescription or that those prescriptions dispense for a legitimate medical purpose. Dr. Catizone

can testify that pharmacists can decline to fill prescriptions when the prescriptions lack legitimate medical purpose. He can state that pharmacists are not physicians and cannot diagnose patients. He can also talk about the compounding practices at the pharmacies, about the customary practice of keeping prescription records, and the "red flags" that the pharmacists must watch for to avoid dispensing controlled substances without medical justification. These opinions are relevant, based on sound methodology, and they do not present a risk of unfair prejudice, confusion of issues, misleading the jury, or waste of time.

However, in light of the requirements of *Daubert* and its progeny, the Court will not allow Dr. Catizone to testify about his opinions on legal matters, or tell the Jury what ultimate conclusions it should reach, or what Defendants' state of mind was when they worked at the Pharmacy. Among these prohibited opinions are the following:

- Defendants "knowingly and willfully engaged in activities that violated state and federal laws" (DE 252-1, Catizone Expert Report at 1);

- "the dispensing of drugs by North Anthony Pharmacy indicated a knowingly and deliberate operation designed for illegal purposes . . ." (*Id.* at 2);

- "cautions were deliberately disregarded for fraudulent purposes . . ." (*Id.*)

- "North Anthony Pharmacy operated in in a knowing environment of activities that violated the federal and state laws and regulations." (*Id.*)

- "That environment resulted in the end that virtually every controlled substance dispensed by North Anthony was for fraudulent and illegal purposes." (*Id.*)

- "it is clear that a dangerous and illegal pattern of abuses and diversions knowingly existed and was supported." (*Id.* at 6)

Likewise, Dr. Catizone may not testify about the standard of care for the physicians as he's not a qualified expert in that field. For example he cannot opine before the Jury that "[i]ndividuals receiving controlled substances dispensed by North Anthony lacked a legitimate medical need . . . " (*Id.* at 3), unless he can explain how a pharmacist in his or her training would be able to determine such need. Similar prohibition, with the same caveat, applies to his opinion that the Pharmacy "posed a significant threat to the health and welfare of patients." (*Id.*)

Finally, while Mr. Catizone may have expertise about the effects of illegal distribution of controlled substances on the communities and patients who abuse them, this evidence is irrelevant as it does not bear on the guilt or innocence of Defendants of the charges in the Indictment. Instead, such information would inflame the sympathies of the jurors, which is prohibited under the rules of evidence.

In summary, the Court GRANTS IN PART and DENIES IN PART the Government's motion.

(c) Lab Experts

Next, the Government intends to call experts from the U.S. Food and Drug Administration to testify regarding lab results for medications dispensed to undercover agents and testosterone found in Ranochak's home on September 11, 2013. Defendants don't object, so the Court GRANTS the Government's motion.

(d) Financial Investigator

Finally, the Government intends to call Thomas M. Coleman, a former IRS Criminal Investigation agent to testify about the financial benefit Defendants derived from their participation in the charged criminal conduct. Defendants object to the motion.

To the extent that Mr. Coleman would testify about his review of the financial records and the information contained in them that reveal any financial motive that Defendants may have had in engaging in the alleged trade of controlled substances, the Court will allow such testimony. However, as explained above, the Government has not provided a propensity-free basis for introducing evidence about the irregularities concerning Ranochak's and Losier's tax returns, which in turn means that Mr. Coleman cannot touch on those issues. Accordingly, the Court GRANTS IN PART and DENIES IN PART the Government's motion.

### C.  Government's Motion in Limine DE 279

*(18)        Defense Pharmacy Expert*

The Government, akin to Defendants' objection to its pharmacy expert, is asking that Defendants' own pharmacy expert, Joseph Bogdan, be prohibited from giving legal opinions regarding Defendants' intent in dispensing controlled substances. Defendants have not objected to the Government's motion.

As discussed above, legal standards are the province of the Court and the Defendant's intent is the province of the jury. *See also, United States v. Kohli*, 847 F.3d 483, 491 (7th Cir. 2017) ("Rule 704 permits experts to testify about an "ultimate issue" in a case, Fed. R. Evid. 704(a), but prohibits them from stating an 'opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense,'

Fed. R. Evid. 704(b).") Accordingly, the Court will exclude the following proposed testimony from Joseph Bogdan:

- "It is not illegal for a pharmacy to compound a medicine that is already commercially available when the product is unavailable for any reason"

- "Both [the pharmacist and physician] can be held liable if the wrong medication is prescribed to the patient"

- off label prescribing is "legal"

- "In the case of North Anthony, the pharmacist did fulfill their corresponding [legal] duties"

  For these reasons, the Court GRANTS the Government's motion (DE 279).

### D. Government's Motion in Limine DE 295

*(19)       Government's Motion to Preclude Admission of Irrelevant Evidence*

The Government states that legal counsel representing Wabash Parkview Hospital has notified it that Defendant Ranochak has sought to obtain various medical records from the hospital for patients identified in the Indictment. The records request spans from 2012 through September 2013. The Government challenges the relevancy of any records Wabash Parkview Hospital may ultimately produce to defendant Ranochak because, to the extent that any of these records were not already in the patient files at the time of the September 11, 2013, search, these records would have no bearing on assessing the medical legitimacy of controlled substance prescriptions issued to these patients from 2012 through September 11, 2013.

Ranochak responded to the motion stating that counsel for Parkview Wabash Hospital advised his attorney that the Hospital would not be honoring the subpoena due to a failure to

comply with HIPAA in getting the consent of the patients. Accordingly, the Government's

motion is MOOT.


### E. Defendants' Motion Regarding the Government's Pharmacy Expert Witness (DE 252)

Defendants moved to exclude the opinions of the Government's expert witness Carmen

Catizone. The Court addressed the contents of this motion above, in the context of the

Government's motion in limine on the same subject. For the reasons explained there, the Court

GRANTS IN PART and DENIES IN PART Defendants' motion.


### F. Defendants' Motion Regarding References in the Indictment to Indiana Administrative Code (DE 253)

Paragraph 15 of the Indictment refers to the requirement under the Indiana

Administrative Code for pharmacists to be sure beyond reasonable doubt in their professional

judgment that the doctor was issuing a prescription in good faith:

> Indiana administrative law also required a pharmacist to be sure beyond a reasonable doubt in his or her professional judgment that the doctor was issuing a prescription in good faith.[4]

(DE 1, Indictment ¶ 15.) Defendants object to the inclusion of this paragraph in the Indictment.

They argue that Federal, not Indiana, law controls a pharmacist's duty with respect to controlled

substances, so this language will confuse the jurors and will wrongfully impose a burden of proof

---

[4]The relevant portion of the Indiana Administrative Code has nearly identical language:
It is the pharmacist's responsibility as with all controlled substances prescriptions, to be sure beyond reasonable doubt in his or her professional judgment that the practitioner is issuing the prescription in good faith and has a valid Drug Enforcement Administration certificate of registration.
856 Ind. Admin. Code 2-6-2.

on Losier and Rinnger.[5] Defendants submit that 21 C.F.R. § 1306.04 is the controlling regulation

for the pharmacists who fill controlled substance prescriptions:

> A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

*Id.* Defendants argue that nothing in federal law indicates that a pharmacist has a duty "to be sure

beyond reasonable doubt in his or her professional judgment that a practitioner is issuing the

prescription in good faith."[6]

The Government objects to the motion, arguing that an indictment can be redacted only if

the language is both not relevant to the charge and inflammatory and prejudicial to Defendants,

which it is neither in this case. The Government anticipates that at trial Losier and Ringger will

claim that the responsibility for medically legitimate controlled substance prescriptions rests

entirely with Ranochak, and it believes that paragraph 15 correctly refutes that notion by

presenting the pharmacists' corresponding duty in ensuring that controlled substance

prescriptions are issued for legitimate medical purposes.

---

[5] At the Final Pretrial Conference, Mr. Ringger's counsel indicated that Defendants also object to paragraph 14 of the Indictment for the same reasons. Like paragraph 15, paragraph 14 is also referring to the Indiana administrative law: "Both doctors and pharmacists, under Indiana administrative law, were responsible for properly prescribing and dispensing controlled substances."

[6] Paragraph 15 of the Indictment inserts the indefinite article "a" in the phrase "beyond reasonable doubt." (DE 1 ¶ 15 (". . . to be sure beyond *a* reasonable doubt . . .") (emphasis added).) Defendants object to this addition as the article is not part of the relevant section in the administrative code. The Government agrees and concedes that the indefinite article should be removed from the phrase.

The Court will deny Defendants' motion as to both paragraphs. Count 1 charges Defendants with a conspiracy to distribute and dispense controlled substances outside the scope of professional practice and not for legitimate medical purposes. Counts 2–9 charge them with unlawfully distributing controlled substances on various occasions. As already noted, 21 U.S.C. § 841(a)(1) makes it a federal crime, "[e]xcept as authorized, . . . for any person knowingly or intentionally . . . to manufacture, distribute, or dispense . . . a controlled substance." While the federal regulations state that a prescription is "authorized" when a licensed practitioner issues it "for a legitimate medical purpose . . . acting in the usual course of his professional practice," 21 C.F.R. § 1306.04(a), the regulations do not define either the "legitimate medical purpose" or the "usual course of [] professional practice." The meaning for those terms is derived from, among other things, considering the standard of care the pharmacists and physicians use in treating their patients. *See United States v. Chube II*, 538 F.3d 693, 698 (7th Cir. 2008) ("[I]t is impossible sensibly to discuss the question whether a physician was acting outside the usual course of professional practice and without a legitimate medical purpose without mentioning the usual standard of care."). To be clear, a defendant is not guilty of violating § 841(a) just because he abandoned the standard of care due to his patients, but the standard of care sheds light on what conduct is authorized. Here, Indiana regulations and customs and practices are relevant to determine whether Defendants acted as drug pushers rather than medical professionals. *Chube II*, 538 F.3d at 698 ("[T]he jury must make a finding of intent not merely with respect to distribution, but also with respect to the doctor's intent to act as a pusher rather than a medical professional.") (quoting *United States v. Feingold*, 454 F.3d 1001, 1008 (9th Cir. 2006). Therefore, the Indictment appropriately includes the reference to the Indiana Administrative Act.

The Court disagrees with Defendants that keeping paragraphs 14 and 15 in the Indictment places a burden of proof upon them. Just like an expert's testimony that a physician must examine a patient before prescribing controlled substances does not place a burden upon Defendants, neither does testimony that Indiana pharmacists must be sure that a prescription for controlled substances is a legitimate one. However, the Court agrees that, given that the Government's burden of proof as to the charges in the Indictment is "beyond a reasonable doubt,"  the reference to "beyond reasonable doubt" in the context of the pharmacists' professional requirements can be confusing to the jury. To this end, the Court DIRECTS the Government to propose a jury instruction that addresses any potential confusion. For these reasons, the Court GRANTS IN PART and DENIES IN PART Defendant's motion.

### G. Ranochak's Motion to Prevent Conflating the Civil Malpractice Standard with the Criminal Conviction Standard (DE 255)

Defendant Ranochak believes that the Government will present to the Jury a standard of conviction that equates civil liability with criminal culpability. Ranochak points out that "the standard of care" is not the same as the criminal conviction standard ("course of professional practice" and "Legitimate medical purpose"). To prevent the Government from confusing the two standards, Ranochak is seeking a ruling that prohibits the Government from eliciting testimony that equates the civil malpractice standard with the criminal conviction standard.

The Government does not dispute that the two standards are different and that the civil malpractice standard is inapplicable in a criminal case. However, the Government objects to Ranochak's motion because it believes that the standard of care provides context from which the Jury can assess whether Defendants' actions are those of medical professionals or drug dealers.

The Court agrees with the Government. As noted in the context of the previous motion, standard of care is relevant to determine whether Defendants acted as drug pushers rather than medical professionals. *Chube II*, 538 F.3d at 698 ("[T]he jury must make a finding of intent not merely with respect to distribution, but also with respect to the doctor's intent to act as a pusher rather than a medical professional.") (quoting *United States v. Feingold*, 454 F.3d 1001, 1008 (9th Cir. 2006). And again, "it is impossible sensibly to discuss the question whether a physician was acting outside the usual course of professional practice and without a legitimate medical purpose without mentioning the usual standard of care." *Chube II*, 538 F.3d at 698. A jury's ability to determine what conduct is outside the professional practice can be assisted by testimony regarding the standards of care and norms of practice applicable to pharmacists and physicians. "[I]t is appropriate in cases such as this for the jury to consider the practitioner's behavior against the benchmark of acceptable and accepted medical practice. Just how that benchmark is expressed to the jury . . . is a matter within the district court's discretion." *United States v. Feingold*, 454 F.3d 1001, 1011 (9th Cir. 2006). The many cases cited by Ranochak (*see* DE 255 at 4–5) do not stand for the proposition that the Government's witness may not testify about the standard of care. Instead, they emphasize that the courts should be cautious not to conflate the two standards and make it appear that medical malpractice is sufficient for a conviction. *See e.g., United States v. Smith*, 573 F.3d 639, 649 (8th Cir. 2009) ("[C]ourts have recognized a danger of confusing medical-malpractice and § 841 standards."); *United States v. Wexler*, 522 F.3d 194, 204 (2d Cir. 2008) ("*While* failure to comply with the standard of care applicable to a medical specialty does not alone provide a basis for concluding that a physician's

activities fall outside the usual course of professional practice, *it surely is relevant to that determination*.") (emphasis added).[7] Accordingly, the Court DENIES Ranochak's motion.

### H. Ranochak's Motion to Prevent Introduction of Prior Decisions or Proceedings by the Medical Review Board relating to His Medical License (DE 256)

Defendant Ranochak may testify in this case and, if he does so, he wants to prevent the Government from presenting evidence at trial regarding disciplinary actions taken against him by the medical licensing board. Ranochak does not provide any details as to why he was disciplined. While the Government indicates that it does not intend to introduce evidence about these disciplinary matters, it does object to the motion as it relates to cross-examination of Ranochak.

Under Federal Rule of Evidence 608(b), "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of . . . the witness . . . ." In other words, Rule 608(b) permits any questions on cross-examination that relate to specific instances of misconduct in the witness's past so long as they are probative of the witness's character for truthfulness and untruthfulness. The admission of such evidence is tempered by Rule 403: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

---

[7] Ranochak cited this excerpt from the opinion without the italicized words, which, of course, completely undermines his position.

At the Final Pretrial Conference, the Government's counsel represented that the Government doesn't intend to introduce evidence regarding disciplinary actions taken against Ranochak by the medical licensing board. Accordingly, the Court GRANTS Ranochak's motion.

## I. Ranochak's and Ringger's, and Losier's Financial Information and Tax Records (DE 257, 260, 261, and 272)

Ranochak, Ringger, and Losier ask the Court to exclude from evidence their financial documents, including the tax returns for 2012–2013. The Court addressed this subject above, including the potential testimony from Mr. Coleman, in the context of the Government's motion in limine. For the reasons explained there, the Court GRANTS IN PART and DENIES IN PART their motions.

## J. Ranochak's Motion to Exclude Evidence of J. Writtenhouse's Death (DE 258)

Ranochak seeks to exclude evidence concerning the death of one of his patients, J. Writtenhouse. In its response, the Government represents that it has no information about this patient and does not intend to introduce any evidence about this patient. Accordingly, the Court GRANTS Ranochak's motion.

## K. Ranochak's Motion to Exclude Evidence about His Work at the Canterbury Pharmacy (DE 259)

Ranochak asks that the Court exclude any evidence about his work at the Canterbury Pharmacy. He believes any such evidence is irrelevant and unfairly prejudicial. The Court

addressed this motion in its *Santiago* ruling (DE 404), and for the reasons stated there, the Court DENIES the motion.

### L.  Ranochak's Motion to Exclude Irrelevant Evidence (DE 262)

The timeframe for the charges in this case is January 2012 through September 11, 2013, for Counts 1–9 and March 2012 through September 2013 for Count 10. Ranochak submits that much of the Government's evidence falls outside these time periods. Thus, he insists that the Government intends to bring irrelevant and unfairly prejudicial evidence against him. In particular he seeks to exclude the following evidence:

1. All records and communications with Miami-Luken and other suppliers of controlled substances after the raid at NAPWC on September 11, 2013;
2. Defendant Dr. James E. Ranochak's move to a new location after the raid at NAPWC on September 11, 2013;
3. Any problems with prescriptions that were issued by defendant Ranochak or were filled at NAPWC after the raid on NAPWC on September 11, 2013;
4. Any information of people who traveled to NAPWC for the period of January 2012 through April 2015;
5. Any statements by Mr. Greg Thompson in October 2013;
6. Any information concerning license plates of motor vehicles at NAPWC in December 2013.

(DE 262 at 3–4.)

In its response, the Government assures the Court that it does not intend to introduce any evidence that is irrelevant to the charges in the Indictment. At the Final Pretrial Conference, the Government further indicated that, of the challenged evidence, it would only seek to present evidence of Ranochak's communications with Miami-Luken and evidence of the patients who traveled to the Pharmacy after the agents searched it. The government believes this evidence is relevant because any change in Ranochak's conduct after the search—for example, any change

in the quantity of ordering controlled substances—or any change in the patient makeup raise inference to him being guilty of the charges.

The Court disagrees with the Government and finds that such evidence would have very little probative value and a great danger of confusing the issues, misleading the jury, and wasting time. *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). There could be numerous reasons why Ranochak would change his practice of ordering medications after the search, and with so little probative value in this evidence, the risk of confusion is amplified. In addition, it's dangerous to pin guilt upon Ranochak on the basis of who continued, or quit, seeing him after the search. Accordingly, the Court GRANTS Ranochak's motion.

### M. Ranochak's Motion to Prohibit Lay Opinion Testimony about His Patients (DE 263)

According to Ranochak, the Government will call at trial Jerry Baker, Dawn Baisden, Delores Myers, and Kenneth Raymers to testify about their observations regarding his patients.[8] He believes they will testify his patients were drug seekers. Ranochak believes that only an expert can testify whether a particular person is a drug seeker and therefore asks for exclusion of their testimony because none of these persons has been qualified as an expert witness. The Government objects to the motion.

_____

[8] The motion also names Jolene Bowers but she has since died.

A witness does not have to hold a specialized knowledge to provide an opinion about his or her observations if the opinion is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. The Court of Appeals for the Second Circuit has succinctly explained the meaning of each prong of this Rule:

> [W]e have observed that (a) the rational-basis requirement "is the familiar requirement of first-hand knowledge or observation," *United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992) (quoting Fed. R. Evid. 701 advisory committee's note on 1972 Proposed Rules); (b) the helpfulness requirement is principally "designed to provide assurance[ ] against the admission of opinions which would merely tell the jury what result to reach," *id.* (quoting Fed. R. Evid. 704 advisory committee's note on 1972 Proposed Rules); and (c) the "not based on specialized knowledge" requirement requires that "a lay opinion must be the product of reasoning processes familiar to the average person in everyday life," *Yuri Garcia*, 413 F.3d at 215. *See also* Fed. R. Evid. 701 advisory committee's note on 2000 amendments.

*United States v. Kaplan*, 490 F.3d 110, 118 (2d Cir. 2007).

The Court will not allow the proposed lay opinion testimony to show that Ranochak's patients were "drug seekers." The proposed witnesses are either former employees at the Pharmacy or Ranochak's patients. At the Final Pretrial Conference, the Government stated that these persons would testify what they saw in Ranochak's waiting room, namely, about the physical demeanor of the patients (being agitated, fidgety, and without pain), their appearance, and their communications with the pharmacists. However, the Government has not established that the proposed witnesses have personal knowledge of what constitutes a "drug seeker." In other words, while the witnesses may—if relevant—testify about their observations of what went on in the waiting room, without the Government's showing that these witnesses have particular knowledge about persons addicted to prescription medications, their lay opinion testimony is

inadmissible. This is so because their opinion testimonies would not be helpful to the jury. *See United States v. Locke*, 643 F.3d 235, 240–41 (7th Cir. 2011) ("[A] lay witness's opinion or inference testimony must be helpful to the finder of fact in order to be admissible."). Lay opinion testimony is meant to provide "the Jury with a more complete picture than would be provided by a recitation of each component fact," *see id*. at 241, but without showing that these witnesses have a basis for knowing what constitutes a "drug seeker," their opinions cannot be said to be reliable. *Cf. id*. (finding that employees of the mortgage brokerages or lenders involved in the defendant's financial transactions could present their lay opinions about the significance of falsehoods because they were familiar with the lending practices). Without that knowledge, their testimony would amount to equating agitated, fidgety, and disheveled looking patients with addicts when experience teaches that it may not always be so. Accordingly, the Court GRANTS Ranochak's motion to prohibit the above listed witnesses from offering lay opinion testimony.

### N. Ranochak's Motion Regarding the Suspension of North Anthony Pharmacy (DE 264)

Ranochak seeks to preclude the Government from admitting any evidence about the suspension of the North Anthony Pharmacy. The Government responds stating that it does not intend to broach this subject before the Jury because the Pharmacy was never suspended. Without an objection, the Court GRANTS the motion.

### O. Ranochak's Motion to Prohibit Dr. Syed Sohail's testimony (DE 269)

Ranochak seeks to exclude Dr. Syed Sohail from testifying at trial on the grounds that anything he would say in this case would be irrelevant. Ranochak is also concerned that the

Government may try to have Dr. Sohail testify about Ranochak's alleged wrongdoings that give rise to a separate criminal case, *United States v. Ranochak*, Cause No. 2:17-CR-117. In that case, Ranochak is accused of falsifying a prescription and falsifying medical records. Ranochak believes that such testimony would entail the evidence of other bad acts which is prohibited by Rule 404(b). Finally, Ranochak insists that Dr. Sohail is incompetent to testify because he suffers from cognitive and memory deficiencies as a result of a stroke or strokes he suffered years ago.

The Government objects to the motion, suggesting Dr. Sohail's testimony would be introduced to refute Ranochak's claim that patients were examined before being prescribed controlled substances. In addition, depending on defenses raised, the Government may seek to introduce the evidence regarding the backdated prescriptions for Testosterone found at this home.

As the Court ruled above in the context of the Government's motion in limine, the evidence regarding the backdated prescriptions is inadmissible because it is evidence of other bad acts prohibited under Rule 404(b). In the same vein, although the parties don't discuss this in their briefs—perhaps because there's no disagreement about it—the existence of the other criminal case involving *Ranochak* may not be disclosed to the Jury.

However, the Court finds no issue with Dr. Sohail testifying that, contrary to Ranochak's testimony at the suppression hearing, he (Dr. Sohail) did not perform medical exams on patients and did not render diagnosis before controlled substance prescriptions were issued. This testimony would be relevant to the charges in this case as it appears to directly contradict Defendants' claim that North Anthony Pharmacy and Wellness Center was a legitimate medical establishment, not a pill mill. The Court finds no unfair prejudice if such evidence is presented to

the Jury because this evidence undermines a defense that is squarely directed to undercut the Government's case against Ranochak.

Moreover, Ranochak cannot prevent the Government from calling Dr. Sohail to the stand by suggesting that he suffers from cognitive and memory deficiencies. As the Government points out and as Ranochak himself concedes by relying on *United States v. Love*, 329 F.3d 981, 984–985 (8th Cir. 2003) (concluding that the district court violated defendant's right of confrontation by limiting his cross-examination regarding witness's mental defect), a diminished mental capacity is a cause for impeachment or discrediting the testimony, not an outright exclusion. Besides, Dr. Sohail was found to be sufficiently competent to enter a guilty plea in his own case, so it appears that he's competent enough to testify at this trial. Ranochak, and the other Defendants will have the opportunity to impeach Dr. Sohail, which is all that is required under the circumstances. *See Love*, 329 F.3d at 984 ("[A] defendant has the right to attempt to challenge a witness's credibility with competent or relevant evidence of any mental defect or treatment at a time probatively related to the time period about which he was attempting to testify.") (quotation marks, brackets, and citation omitted).

Accordingly, the Court GRANTS IN PART and DENIES IN PART Ranochak's motion.

## P. Government's Motion to Admit Losier's Prior Conviction

In preparation for the Final Pretrial Conference, the Government indicated its intent to introduce at trial Losier's prior conviction under Rule 609. (DE 400  at 7–8.) Losier objects to the motion. (DE 403 at 2–3.)

Losier was previously convicted of theft of property in 2003. According to the Government, Losier knowingly obtained the property of another person, by deception or by

threat, with the purpose of depriving the owner thereof, with the property having a value in excess of $2,500. According to the probable cause affidavit, Losier, while working as a pharmacist, misappropriated money from his employer by depositing checks made payable to his employer and then transferring the checks to his personal account. [9] Losier pled guilty and was ordered to pay $15,588.85 in restitution.

For the purpose of attacking the character for truthfulness of the defendant as a witness, evidence of a prior felony conviction "must be admitted . . . if the probative value of the evidence outweighs its prejudicial effect to that defendant." Red. R. Evid. 609(a)(1)(B). However, "for any crime regardless of the punishment, the evidence must be admitted if the court can readily determine that establishing the elements of the crime required proving—or the witness's admitting—a dishonest act or false statement." Fed. R. Evid. 609(a)(2). Still, convictions that are old have additional considerations:

> **(b) Limit on Using the Evidence After 10 Years.** This subdivision (b) applies if more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later. Evidence of the conviction is admissible only if:
>
> (1) its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect; and
>
> (2) the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use.

The factors a court should consider in analyzing a conviction under this subsection are: (1) the impeachment value of the prior crime; (2) the point in time of the conviction and the witness' subsequent history; (3) the similarity between the past crime and the charged crime; (4)

---

[9] Although the parties don't specify, this appears to be the same conviction referenced above in relation to Losier's failure to disclose that his pharmacy license was suspended in 2002.

the importance of the defendant's testimony; and, (5) the centrality of the credibility issue.
*United States v. Mahone*, 537 F.2d 922, 929 (7th Cir. 1976).

Having considered all the factors, the Court finds that the Government can introduce evidence about Losier's conviction in order to impeach him if he testifies. Although the conviction is twenty years old, its probative value in determining Losier's character for truthfulness is very probative and outweighs its prejudicial effect to him. Losier was convicted of stealing from his previous employer, that is, of a crime of dishonesty. At the same time, if Losier testifies, the issue of his credibility will be at the center of his case because he will be challenging the Government's assertions that he knew that he was acting in an unauthorized manner in dispensing the prescriptions. Therefore, Losier's knowledge—the state of mind—is a key factor in the Government's case, and his conviction involving dishonesty is relevant in allowing the jury to determine how truthful Losier's testimony is. In other words, his testimony will have great importance on the outcome of the jury verdict concerning the charges against him. In addition, both the previous conviction and the current charges have in common Losier's desire to unlawfully enrich himself. What is worse, Losier has perpetuated his dishonesty by failing to disclose his conviction to the DEA when applying for the North Anthony Pharmacy registration.

Although the probative value outweighs its prejudicial effect to Losier, the Court will further minimize any semblance of unfair prejudice by prohibiting the Government from presenting the details of Losier's conviction, including the fact that the conviction took place in a pharmacy setting. Instead, the evidence must be limited to the fact that Losier has a theft conviction from 2003. With these limitations, the Court GRANTS the Government's motion to introduce into evidence Losier's conviction if he testifies at trial.

**Q. Miscellaneous Matters**

*(1) Timing of Witness Disclosure*

At the Final Pretrial Conference, the Court discussed with counsel the timing of witness disclosures. The Government has represented that all of its witnesses are known to Defendants except for several former patients of the Pharmacy who are still being interviewed. As to them, the Government's counsel have not yet decided who will be called to testify. Having considered the interests of both sides, the Court affirms its requirement for witness disclosure in the discovery order:

> As to witness lists and prior statements governed by 18 U.S.C. § 3500 and Rule 26.2, Fed. R. Crim. P., the court urges the government to make disclosure to counsel for the defendant as soon as the government deems prudent. The court declines, however, to compel disclosure of witnesses more than one working day before trial.

(DE 345 at 4.)

*(2) Number of Peremptory Challenges*

Defendants are asking for 16 peremptory challenges, instead of the 10 provided by the Federal Rule of Criminal Procedure 24(b), which they intend to use jointly. After considering the parties' need to select impartial jurors who can serve attentively for a three-week period, the Court will allow Defendants a total of 12 peremptory challenges.

*(3) Counts 2 and 10*

Mr. Ringger moved to dismiss Counts 2 and 10 of the Indictment (DE 409), but his arguments are meritless. Count 2 charges Defendants with knowingly distributing and dispensing "a prescription for Androgel (testosterone) . . . to patient JR outside the scope of professional

45

practice and not for legitimate medical purpose." (DE 1 at 7.) Mr. Ringger contends that this count should be dismissed because it's not illegal to distribute and dispense "a prescription." A quick reference to a dictionary puts Mr. Ringger's argument to rest. The word "prescription" has a dual meaning. It is both "[a] doctor's written instruction for the composition and use of a medicine," and "[t]he medicine prescribed in this way." Oxford American Dictionary, Oxford University Press (1980). And it is clear that the Indictment charges Defendants with distributing and dispensing the latter not the former, which is illegal if done without authorization. *See* 18 U.S.C. § 841(a)(1).

As for Count 10, Mr. Ringger insists that it is "inherently contradictory." (DE 409 at 5.) He claims that Count 10 "purports to be a conspiracy charge under section 371 (as captioned) but nowhere does it actually allege in its substantive allegations that the defendants  combined, conspired, or agreed to commit a federal crime. Instead, it alleges that the defendants willfully executed a scheme to defraud Indiana Medicaid. But that is not crime under section 371." (*Id*. 5–6.) Mr. Ringger provides no further argument or authority in support of his motion to dismiss Count 10.

Under the Federal Rules of Criminal Procedure 7(c)(1) an indictment must be "a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . " Fed. R. Crim. P. 7(c)(1). The Court of Appeal for the Seventh Circuit has said that "[a]n indictment is constitutionally sufficient and satisfies Fed. R. Crim. P. 7(c)(1) if it states the elements of the crime charged, informs the defendant of the nature of the charge so she may prepare a defense, and enables the defendant to plead the judgment as a bar against future prosecutions for the same offense." *United States v. Agostino*, 132 F.3d 1183, 1189 (7th Cir. 1997) (citing *Hamling v. United States*, 418 U.S. 87, 94 (1974)). A defendant has sufficient

notice of the charges against him or her when it provides "some means pinning down the specific conduct at issue." *United States v. Harvey*, 484 F.3d 453, 456 (7th Cir. 2007) (quoting *United States v. Smith*, 230 F.3d 300, 305 (7th Cir. 2000)). "Indictments are reviewed on a practical basis and in their entirety, rather than in a hypertechnical manner." *Smith*, 230 F.3d at 305 (internal quotations omitted). "The question is not 'whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards.'" *Harvey*, 484 F.3d at 456 (7th Cir. 2007) (quoting *United States v. Allender*, 62 F.3d 909, 914 (1995)).

Omitting the word "conspired" on page 16 of the Indictment does create some confusion, but when Count 10 is read in its entirety, there's no question that Defendants are put on notice that they are charged with conspiring "to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons [did] any act to effect the object of the conspiracy . . . ." 18 U.S.C. § 371. Count 10 is named "Conspiracy to Commit Health Care Fraud." The introductory section of Count 10 gives the background to the Indiana Medicaid Program, the requirements for the participants in the program, and the medications dispensed at the North Anthony Pharmacy. It then proceeds with a section named "Conspiracy to Defraud Indiana Medicaid Program." This section includes the suggested confusing language: " . . . the defendants . . . knowingly and willfully executed a scheme and artifice to defraud Indiana Medicaid . . . ." (DE 1 at 16.) However, the next section sets out the purposes of the conspiracy ("to unlawfully enrich themselves"), and the final section lists specific acts in furtherance of the conspiracy. It concludes with a statement "[a]ll in violation of Title 18, United States Code, Section 371." (DE 1 at 17.)

Therefore, although the reference to "executing a scheme and artifice" on page 16 could be confusing in isolation, the totality of the charge gives a sufficient notice to Defendants that they are charged with conspiracy to defraud the United States or any of its agencies, as opposed to merely executing a scheme and artifice to defraud Indiana Medicaid. This conforms to minimal constitutional standards. *Cf. Harvey*, 484 F.3d at 457 (finding the indictment sufficient where defendant knew the essence of the charges he was facing).

For these reasons, the Court DENIES Mr. Ringger's motion to dismiss Counts 2 and 10 of the Indictment.

### (4) Lack of Civil Action Against Defendants

At the Final Pretrial Conference, the Government expressed concern that Defendants will point out to the Jury that neither the federal nor state agencies brought any civil enforcement actions against them. While Defendants agreed that such evidence is irrelevant, the Court underscores its inadmissibility. Such evidence is indeed irrelevant and the minimal probative value that it may have is substantially outweighed by a danger of confusing the issues, misleading the jury, and wasting time. *See* Fed. R. Evid. 403. Civil cases, especially administrative ones, have different legal standards and different considerations, so discussing them in the context of the criminal case would contravene Rule 403. *Cf. United States Sec. & Exch. Comm'n v. Bluepoint Inv. Couns. LLC*, No. 19-CV-809-WMC, 2021 WL 5326740, at *3 (W.D. Wis. Nov. 16, 2021) (lack of criminal charges does not bear on merits of civil case)

Related to this issue is Losier's desire to let the Jury know that he's currently a licensed pharmacist. His license was apparently suspended but has now been restored. This is the flipside of Ranochak's motion to keep out the medical board's disciplinary actions against him discussed

above. *Cf. Bhalerao v. Illinois Dep't of Fin. & Pro. Reguls.*, 834 F. Supp.2d 775, 789 (N.D. Ill. 2011) ("License revocation is not a criminal prosecution and is neither a judgment of the illegality of such acts nor the infliction of a punishment for them . . . .). After all, a favorable board decision must be treated the same as an unfavorable one: it may not be admitted into evidence because it is irrelevant. At best, like the evidence concerning the lack of civil enforcement against Defendants, the licensing issue is only minimally probative and highly suspect under Rule 403. What matters in this case for Losier is not what the pharmacy board decided about his license but whether he committed the crimes as charged. The evidence that his pharmacist license was restored has no bearing on that question. *See* Fed. R. Evid. 401 (Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.")

### R. Conclusion

Having addressed each of the parties' pretrial contentions, the Court DIRECTS the Clerk to term the following motions: DE 252–253, 255–264, 266–267, 269, 272, 279, 295, and 409.

SO ORDERED.

ENTERED: September 19, 2022

_____/s/ JON E. DEGUILIO_____
Chief Judge
United States District Court